**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Glenn Goldan, et al., <br><br> Plaintiffs, <br> vs. <br><br> Toll Brothers AZ Limited Partnership, <br><br> Defendant. | No. CV-25-00529-PHX-SPL <br><br> **ORDER** |

Before the Court is Plaintiffs Glenn and Shelle Goldan's Petition and Motion to Vacate Arbitrator's Award (Doc. 1), Defendant Toll Brothers AZ Limited Partnership's Answer (Doc. 7), and Plaintiffs' Reply (Doc. 9), in which Plaintiffs seek vacatur of a final arbitration award issued in Defendant's favor. Also before the Court is Defendant's Application to Confirm Arbitration Award (Doc. 10), Plaintiffs' Response (Doc. 12), and Defendant's Reply (Doc. 13), in which Defendant requests this Court confirm the final arbitration award. The Court now rules as follows.[1]

**I.    BACKGROUND**

The key background facts are incorporated in large part from the arbitrator's detailed factual findings set forth in her Decision on the Merits (Doc. 1-1). Plaintiffs do not dispute the arbitrator's findings of facts, but rather how she applied the facts to the law.

---

[1] Because it would not assist in resolution of the instant issues, the Court finds the pending motion is suitable for decision without oral argument. *See* LRCiv. 7.2(f); Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

(Doc. 1 at 3).

In May 2022, Plaintiffs entered into a contract (the "Agreement of Sale" or "Agreement") for a $2.7 million single-family residence in Fountain Hills, Arizona to be built by Defendant. (Doc. 1 at 1; Doc. 1-1 at 3). The Agreement was secured by an earnest money deposit of $135,075.00 and an additional promissory note in the amount of $135,075.00. (Doc. 1-1 at 2–3). On May 31, 2022, Plaintiffs visited the home with an inspector, who prepared a report (the "AJF Report") regarding minor issues found within the home. (*Id.* at 4). The AJF Report was sent to Defendant on June 4. (*Id.*). At that time, the issue most concerning to Plaintiffs was that the windows and doors were flawed and difficult to open. (*Id.*). Defendant advised Plaintiffs that it would forward the report to the construction team to address these items. (*Id.*).

Pursuant to the terms of the Agreement, Defendant offered Plaintiffs two formal walk-throughs of the home with a Toll representative prior to closing. (*Id.*). The first walk-through (the "Initial Walk-Through") "was an opportunity for the Goldans to inspect the Home and to identify variances from the performance standards and to identify punch list items they wanted repaired prior to closing." (*Id.* at 5). The second walk-through would occur on the date of closing "to inspect the repairs performed since the Initial Walk-Through" and "note any work not yet repaired," which would be carried over after closing. (*Id.*). Under the Agreement, Defendant "had until closing to remedy punch list items noted in writing." (*Id.*). The arbitrator ultimately found that "[t]he evidence was that all of the punch list items noted by the Goldans or in the AJF Report, with the exception of one window on back order, had been addressed as of the closing date." (*Id.*).

On June 13, 2022, Mr. Goldan had a phone call with Toll's warranty manager, who "introduced himself and advised that he was the one that would be managing any service items after closing." (*Id.*). Mr. Goldan became concerned about the prospect of the punch list items not being completed prior to closing, leading him to search Toll online. (*Id.*). "Based on his online searches he developed concerns about Toll's reputation and warranty service." (*Id.*).

The Initial Walk-Through was scheduled for July 7, 2022. (*Id.*). Plaintiffs attended it with a construction expert, whom they had recruited "to determine why the windows and doors were not operating correctly." (*Id.* at 6). On June 29, 2022, prior to the Initial Walk-Through, a Toll sales team member had emailed Plaintiffs confirming that the windows and doors were operating smoothly, but that statement was incorrect at the time. (*Id.* at 5–6). Plaintiffs were ultimately only able to attend part of the scheduled walk-through due to travel delays, and contrary to standard Toll policy, Defendant "had the Goldans sign an incomplete Inspection Form" before they left. (*Id.* at 6). Also contrary to standard Toll policy, Defendant never provided Plaintiffs with the inspection form "even though the Goldans requested it on at least two occasions." (*Id.*). Plaintiffs' construction expert remained at the home with the Toll representative after Plaintiffs departed, and he "expressed issues with the windows and doors not operating correctly, space between interior door jambs and doors when closed, a bent window frame, and an 8' to 10' foot crack in the slab in the garage." (*Id.*). Based on the garage crack and the previous window and door issues, the expert later "told the Goldans that there was a potential for a structural issue," but he did not raise the structural concern with the Toll representative at that time. (*Id.*).

On July 12, 2022, Plaintiffs' attorney sent a letter to Defendant conveying Plaintiffs' concerns "about the quality and structure on the Property," requesting two weeks to conduct additional inspections, and seeking an extension of the closing date from July 14 to August 14, 2022. (*Id.* at 7). The letter indicated that a more detailed inspection report was being prepared, but Plaintiffs never sent any additional reports to Defendant regarding their structural concerns. (*Id.* at 8). Nonetheless, the letter "unequivocally advised Toll that the Goldans would not be closing on July 14," but it "did not specifically state what Toll needed to do in order for the Goldans to close," nor did it explicitly request "adequate assurances." (*Id.*). On July 15, Defendant's regional counsel responded to the letter, noting that "Toll reviewed the cracks in the garage and that they were determined to be within applicable tolerances and performance standards." (*Id.*). As for the other concerns,

Defendant's reply letter characterized them as "minor punch list items that did not warrant extension of the closing date or cancellation of the Agreement," also noting that some of the punch list items had already been addressed. (*Id.*). Despite contending that Plaintiffs' refusal to close constituted a material default of the Agreement, Defendant agreed to extend the closing date to July 29, 2022. (*Id.*).

On July 20, a phone call took place between Mr. Goldan, his attorney, and Defendant's regional counsel. (*Id.* at 9). Mr. Goldan wanted Defendant's express consent to conduct further non-invasive structural testing (a "manometer test") at his own expense, but Defendant "did not provide a direct yes or no," and "all of the evidence shows that [Defendant's Regional Counsel] simply ignored it." (*Id.*). The arbitrator found that "[t]his failure of communication regarding the manometer test was one of the main reasons the Goldans decided not to close on the Home." (*Id.*). While Plaintiffs began searching for a different home within the community, Defendant continued to prepare for the July 29 closing date. (*Id.*). Plaintiffs did not appear for the final July 29 walk-through. (*Id.*).

On August 2, Plaintiffs' counsel sent a letter to Defendant stating that Plaintiffs would not be closing on the home and demanding return of their earnest money deposit. (*Id.*). Pursuant to the Agreement, Defendant had seven days to cure any written notice of default, but Plaintiffs "did not provide Toll with the opportunity" to do so. (*Id.* at 9–10). On August 3, Defendant reached out to Plaintiffs "to see if they could bring the matter to resolution" and invited "a reduced offer as inducement for the Goldans to close." (*Id.* at 10). On August 4, Plaintiffs were present in the community to inspect a different home lot. (*Id.*). Although they would have had the opportunity to return to the contracted home "to confirm whether the AJF Report items and punch list items" had been completed, they did not do so. (*Id.*). The arbitrator noted that, had Plaintiffs returned to the home on August 4, within the seven-day cure period, "they would have discovered that most of the items complained of had been repaired with the exception of the one window on back order." (*Id.*).

On August 5, Plaintiffs confirmed via email that they would not be closing. (*Id.*).

On August 8, Defendant wrote to Plaintiffs' counsel "disputing the allegation of serious defects in the Home, advising that the windows and doors, one of the Goldans' key concerns, were remedied and performing as expected," denying that the garage crack was indicative of a structural defect, and noting that the Agreement provided Plaintiffs with a ten-year structural warranty. (*Id.*). Because Plaintiffs had failed to perform, Defendant terminated the Agreement and informed Plaintiffs it was retaining the cash deposit and reserving the right to collect on the promissory note.

In May 2023, Plaintiffs brought an arbitration demand against Defendant related to the cancelled purchase, seeking full return of their earnest deposit and a declaration that the promissory note was null and void. (Doc. 10 at 2, 4). Renee Gerstman, Esq. was appointed to serve as arbitrator, and a hearing was held in June 2024. (*Id.*). On January 16, 2025, the arbitrator issued a Final Award in favor of Defendant and awarded damages, costs, and fees totaling $336,247.56. (Doc. 10-1 at 2, 38; 10-2 at 2). Thereafter, Defendant filed an Application to Confirm the Final Award in Maricopa County Superior Court on February 5, 2025. (Doc. 10 at 4). On February 14, 2025, Plaintiffs filed the instant Motion to Vacate in this Court based on diversity jurisdiction. (Doc. 1). While Plaintiffs seek to vacate the arbitration award, Defendant seeks a judgment confirming the award. (Doc. 10).

## II.     LEGAL STANDARD

The Federal Arbitration Act ("FAA") provides that "at any time within one year" after an arbitration award is made, "any party to the arbitration may apply to the court" for an order confirming the arbitration award, and "the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of" the Act. 9 U.S.C. § 9. Grounds for vacatur of an arbitration award include (1) "where the award was procured by corruption, fraud, or undue means;" (2) "where there was evident partiality or corruption in the arbitrators;" (3) "where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced;" and (4) "where the arbitrators

exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10. Section 10 of the FAA provides the exclusive means by which a reviewing court may grant vacatur of a final arbitration award. *Biller v. Toyota Motor Corp.*, 668 F.3d 655, 664 (9th Cir. 2012). "The burden of establishing grounds for vacating an arbitration award is on the party seeking it." *U.S. Life Ins. Co. v. Superior Nat. Ins. Co.*, 591 F.3d 1167, 1173 (9th Cir. 2010).

Under section 10(a)(4) of the FAA, an arbitrator "exceed[s] their powers when they express a 'manifest disregard of law,' or when they issue an award that is 'completely irrational.'" *Bosack v. Soward*, 586 F.3d 1096, 1104 (9th Cir. 2009) (quoting *Comedy Club, Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1290 (9th Cir. 2009)). "Completely irrational means an award fails to draw its essence from the agreement . . . viewed in light of the agreement's language and context, as well as other indications of the parties' intentions." *Caremark LLC v. AIDS Healthcare Found.*, No. CV-21-01913-PHX-DJH, 2022 WL 4267791, at *5 (D. Ariz. Sept. 15, 2022) (internal citations and quotation marks omitted). "Manifest disregard of the law means that 'the arbitrators recognized the applicable law and then ignored it.'" *Id.* (quoting *Luong v. Circuit City Stores, Inc.*, 368 F.3d 1109, 1112 (9th Cir. 2004)).

The limited grounds provided for federal courts to vacate an arbitration award under the FAA are "designed to preserve due process but not to permit unnecessary public intrusion into private arbitration procedures." *Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.*, 341 F.3d 987, 998 (9th Cir. 2003). "Broad judicial review of arbitration decisions could well jeopardize the very benefits of arbitration, rendering informal arbitration merely a prelude to a more cumbersome and time-consuming judicial review process." *Id.* Review of an arbitration award is therefore both limited and highly deferential. *Comedy Club*, 553 F.3d at 1288.

### III. DISCUSSION

Here, Plaintiffs argue that the arbitrator manifestly disregarded the law in two ways: (1) by concluding that Plaintiffs' concerns were not reasonable, and (2) by concluding that

Defendant's silence constituted adequate assurance. (Doc. 1 at 8, 11). Arizona follows the Restatement of Contracts, which the arbitrator applied to the facts at hand. (Doc. 1 at 5). Under the Restatement, a party to a contract who has reasonable grounds to be concerned that the other party may breach may demand adequate assurance of due performance:

> (1) Where reasonable grounds arise to believe that the obligor will commit a breach by non-performance that would of itself give the obligee a claim for damages for total breach under § 243, the obligee may demand adequate assurance of due performance and may, if reasonable, suspend any performance for which he has not already received the agreed exchange until he receives such assurance.
>
> (2) The obligee may treat as a repudiation the obligor's failure to provide within a reasonable time such assurance of due performance as is adequate in the circumstances of the particular case.

Restatement (Second) of Contracts § 251 (A.L.I. 1981).

The arbitrator analyzed whether Plaintiffs had reasonable grounds to believe Defendant would commit total breach, noting that Plaintiffs' claim "is not based on a specific contractual obligation" in the Agreement that Defendant failed to fulfill, but rather "that Toll's failure, by silence or unwillingness, to authorize the manometer test coupled with several other missteps by Toll (the email of June 29 advising that the windows were operating smoothly when they were not, failing to provide the Inspection Form and refusing to extend the closing date by 30 days) constituted a repudiation of the Agreement by Toll." (Doc. 1-1 at 11). Plaintiffs argue that the arbitrator improperly determined that Plaintiffs' fears were not reasonable because, with the benefit of hindsight, it turned out that there were no structural issues with the house. (Doc. 1 at 6, 8). In other words, they argue that "she effectively changed the question from whether the Goldans' request was *reasonable at the time*, to whether the Goldans were *correct* that the home suffered from foundational defects." (*Id.* at 8).

But the record simply does not support that the arbitrator ignored and misapplied the relevant law by evaluating reasonability through the lens of hindsight. As the arbitrator stated, "[b]oth parties share responsibility for failures in the sales and walk-through

7

process." (Doc. 1-1 at 13). Plaintiffs had understandable worries about the quality of the home, but they did not have objectively reasonable grounds to believe that Defendant would commit total breach of the Agreement. With respect to the garage crack, Plaintiffs' concern that this evinced structural problems in the home was based in part on issues with the windows and doors—but on August 8, Defendant informed Plaintiffs that the windows and doors were performing as expected. (Doc. 1-1 at 10). Had Plaintiffs attended their July 29 closing walk-through or returned to the home during the seven-day cure period, they would have been able to gauge this for themselves. (*Id.* at 9–10). And the existence of the crack in the garage floor, on its own, was an objectively insufficient reason to believe that there were structural issues with the home, as Plaintiffs' own construction expert acknowledged that "the existence of a crack in a post-tension slab does not necessarily indicate a structural issue." (*Id.* at 8). Furthermore, on July 15, Defendant's Regional Counsel told Plaintiffs that it had "reviewed the cracks in the garage and that they were determined to be within applicable tolerances and performance standards." (*Id.*).

The arbitrator neither disregarded the law nor misapplied it when she concluded that Plaintiffs' subjective concerns "did not give them the right to simply step away from the Agreement and fail to stay in contact with Toll, communicate their intentions or return to the Home to confirm that Toll had corrected the windows and doors and punch list items." (*Id.* at 16). The arbitrator had ample reason to rationally conclude that Plaintiffs' insecurities were unreasonable *at the time* they refused to close on the home, not just in hindsight.

Plaintiffs' focus on Defendant's failure to explicitly permit the manometer test is also irrelevant. As Defendant points out, "[t]he question is not whether [Plaintiffs'] request for the manometer test was reasonable. . . . [T]he question is whether Petitioners had an objectively reasonable basis on which to believe that Toll w[ould] commit a breach by non-performance." (Doc. 7 at 19). Furthermore, "[w]hile Toll did not expressly authorize the manometer test, it provided a 15-day extension of the closing date based on the Goldans' representation that they needed 2 weeks to conduct additional testing." (Doc. 1-1 at 14).

The manometer test is also only relevant insofar as Plaintiffs sought assurance that there were no structural defects within the home, but they had received ample other assurances that the crack in the garage was not indicative of such a defect. The manometer test therefore did not furnish Plaintiffs with any reason to assume Defendant would breach the Agreement.

None of Defendant's actions gave Plaintiffs reasonable grounds to anticipate non-performance of the Agreement, and on the contrary, Defendant attempted at multiple points to communicate and negotiate with Plaintiffs both before and after they expressed their intention not to follow through with the closing. To be sure, the sequence of events culminating in this litigation was rife with miscommunications from both parties. But Plaintiffs have not met the high burden to show that the arbitrator was "completely irrational" or "manifestly disregarded the law." *See, e.g.*, *Paynter v. UBS Fin. Servs. Inc.*, No. CV-21-02024-PHX-DJH, 2023 WL 2330715, at *7–8 (D. Ariz. Mar. 2, 2023).

Second, Plaintiffs argue that the arbitrator erred by concluding "that Toll's silence constituted adequate assurance." (Doc. 1 at 11). But Plaintiffs mischaracterize the arbitrator's findings entirely. The arbitrator explicitly found that "Toll repeatedly assured the Goldans that they would comply with their contractual obligations such as repairing the defects and punch list items . . . . The one assurance that Toll did not give was to give express permission to conduct a water level test of the Home to address the Goldans' concern about the garage crack in the post-tension slab. Toll did, however, provide assurances." (Doc. 1-1 at 17). Plaintiffs' position seems to be, in essence, that their right to adequate assurances them entitled them to a specific assurance that they could conduct a manometer test—but the Restatement of Contracts only requires that an obligor provide assurances as are "adequate in the circumstances of the particular case," not assurances that meet Plaintiffs' subjective expectations for the assurances they wished to receive. Plaintiffs' argument is further defeated by the simple fact that because the arbitrator correctly concluded that Plaintiffs' concerns did not constitute reasonable grounds to believe that Defendant would commit a total breach of the Agreement, Plaintiffs were

9

never entitled to adequate assurances from Defendant that it would perform.

## IV. CONCLUSION

The standard for vacatur of an arbitration award is high, and Plaintiffs have not met their burden to show they are entitled to such vacatur. The arbitrator in this matter thoroughly considered all the facts, the evidence, and the arguments of both parties, and she correctly applied the relevant law. Plaintiffs seek to re-litigate the matter because they dislike the arbitrator's conclusion—and while this is understandable, it does not justify this Court intruding into the parties' contractually agreed-upon arbitration proceedings. *See Kyocera Corp.*, 341 F.3d at 998.

Accordingly,

**IT IS ORDERED** that Plaintiffs' Petition and Motion to Vacate Arbitrator's Award (Doc. 1) is **denied**, and Defendant's Application to Confirm Arbitration Award (Doc. 10) is **granted**.

**IT IS FURTHER ORDERED** that the Final Award dated January 16, 2025 in the matter executed by arbitrator Renee Gertsman, Esq., American Arbitration Association Case No. 01-23-0002-1608 (Doc. 10-1 at 36–38), is **confirmed** pursuant to 9 U.S.C. § 9. In accordance with the Award, Defendant shall retain the earnest money cash deposit in the amount of $137,075.00. Defendant is awarded additional damages for the promissory note, pre-judgment interest, and attorneys' fees and costs, as set forth in the Final Award (Doc. 10-1 at 38), in the amount of $336,247.56.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment in favor of Defendant Toll Brothers AZ Limited Partnership confirming the Final Award and **terminate** this case.

Dated this 15th day of July, 2025.

Honorable Steven P. Logan
United States District Judge